## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ROBERT MOORE**, *et al.*,

    *Plaintiffs*,

**v.**

**CENTRAL INTELLIGENCE AGENCY**,

    *Defendant*.

Case No. **1:20-cv-1027-RCL**

## MEMORANDUM OPINION

Plaintiffs Robert Moore, Jana Orear, Christianne O'Malley, and Mark Sauter seek disclosure of certain Korean War-era prisoner-of-war records held by the Central Intelligence Agency ("CIA") pursuant to the Freedom of Information Act ("FOIA"). After failing to receive a satisfactory response from the CIA, plaintiffs filed this action. Compl., ECF No. 1. Now, both parties move for summary judgment. CIA Mot. for Summ. J. ("CIA Mot."), ECF No. 21; Plaintiffs' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 25. Plaintiffs also move for *in camera* review of certain contested documents. ECF No. 26.

As explained below, the Court will **DENY** plaintiffs' motion for summary judgment and **GRANT IN PART** and **DENY IN PART** defendant's motion for summary judgment. The Court will **DENY** without prejudice both motions for summary judgment with respect to the adequacy of the CIA's search for records and **ORDER** defendant to supplement the record regarding the adequacy of the search. The Court will **GRANT** defendant's motion for summary judgment and **DENY** plaintiffs' motion for summary judgment with respect to (1) defendant's Exemption 1, 3, and 6 withholdings; and (2) the CIA's segregability analysis. The CIA issued a *Glomar* response to several of plaintiffs' FOIA requests. The Court will **GRANT** summary judgment to the CIA

1

regarding five of the requests, **DENY** both summary judgment motions as to two of the requests, and **ORDER** defendant to (1) identify any records related to request 1 and (2) supplement the record as to request 17. Finally, the Court will **DENY** plaintiffs' motion for *in camera* review.

## I.   BACKGROUND

United States Air Force Captain Harry Cecil Moore was shot down over North Korea on June 1, 1951 during the Korean War. Compl. 2–3. Captain Moore was taken prisoner and transported to the former Soviet Union, where he was interrogated. *Id.* at 2. Eight months after Captain Moore was shot down over North Korea, the Chief of Naval Personnel wrote to a fellow naval officer "that there [was] a possibility that Captain Moore survived and is now a prisoner of war." *Id.* But it was not until 2002 that the government revealed to Captain Moore's relatives that Moore had survived the crash and had been a prisoner of war in the former Soviet Union. *Id.* at 3.

On November 25, 2019, plaintiffs submitted a FOIA petition to the CIA with twenty-one individualized requests for information. Compl. ¶ 8. After they received no response, this action was filed on April 20, 2020. Compl. at 1. On October 7, 2020, the CIA issued its first response to plaintiffs' requests. ECF No. 21-1 at ¶ 17. The CIA then periodically produced documents before issuing its final response on November 16, 2021. *Id.* ¶ 18–24. Ultimately, the CIA produced six documents in full, twenty-nine in part, and withheld four documents in full. *Id.* ¶ 25. The CIA withheld and redacted certain documents based on FOIA Exemptions 1, 3, and 6. Vaughn Index, ECF No. 22-1; Decl. of Vanna Blaine ("Blaine Decl."), ECF 21-2.

## II.   LEGAL STANDARDS

### A. The Freedom of Information Act

The FOIA provides an avenue for anyone to request—and receive—the disclosure of government records. 5 U.S.C. § 552. "FOIA mandates a 'strong presumption in favor of disclosure.'" *A.C.L.U. v. U.S. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Nat'l Ass'n*

*of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)). Therefore, "agencies may withhold only those documents or portions thereof that fall under one of nine delineated statutory exemptions." *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 845 (D.C. Cir. 2010). But because the FOIA mandates a presumption of disclosure, an agency withholding material pursuant to FOIA exemptions "bears the burden of showing that withheld material falls within the asserted exemption." *Id.* (citing 5 U.S.C. § 552(a)(4)(B)).

### B. Summary Judgment

A court may grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). FOIA cases are usually decided on summary judgment motions. *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Where the party seeking disclosure challenges an agency's withholding of records, "the agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates that each document that falls within the class requested . . . is wholly exempt from [the FOIA's] disclosure requirements." *Shapiro v. Dep't of Just.*, 34 F. Supp. 3d 89, 94 (D.D.C. 2014) (citing *Moayedi v. U.S. Customs & Border Prot.*, 510 F. Supp. 2d 73, 78 (D.D.C. 2007). An agency meets this burden if any combination of its *Vaughn* Index, affidavits, or declarations "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). An agency's justifications will be upheld if they are "logical" or "plausible." *Wolf v. Cent. Intel. Agency*, 473 F.3d 370, 375 (D.C. Cir. 2007) (citations omitted).

Furthermore, a court deciding summary judgment motions "must make specific findings" as to whether any "reasonably segregable portion of a record" is non-exempt and releasable

"[b]efore approving the application of a FOIA exemption." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (citing 5 U.S.C. § 552(b)). A court must also determine whether an agency has shown "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

If an agency affidavit or declaration is "conclusory," "contradicted in the record[,]" or there is "evidence in the record of agency bad faith," then summary judgment is not appropriate and a court may grant *in camera* review as a "last resort." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). The Court has "'broad discretion' to decide whether *in camera* review is necessary." *100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 166 (D.D.C. 2017) (citation omitted).

### III.   DISCUSSION

The CIA withheld records under FOIA Exemptions 1, 3, and 6. In support of its motion for summary judgment, it argues that all documents withheld in whole or in part fall within a proper FOIA exemption and that there is no genuine dispute of material fact. *See* CIA Mot. 1. In response, plaintiffs argue (1) that the CIA failed to adequately search all records as required under the FOIA; (2) that the CIA improperly applied Exemptions 1, 3, and 6 of the FOIA; (3) that the CIA did not conduct a proper segregability analysis; and (4) that the nature of the controversy is such to make *in camera* review by the Court appropriate. *See* Pls.' Mot. 3–13, 23–28; ECF No. 26. Below, the Court will first address the adequacy of the search. Then, it will review the CIA's withholdings under the FOIA exemptions and determine whether the CIA performed an adequate segregability analysis. Finally, the Court will consider the plaintiffs' request for *in camera* review of certain documents.

### A.  The Adequacy of the CIA's Search

To succeed on its motion for summary judgment, the CIA "must show that it made a good faith effort to search for the requested records." *Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 66 (D.D.C. 2020) (quoting *Oglesby*, 920 F.2d at 68). While an agency is not required to search *every* record system, the agency must set forth facts (typically in an affidavit) to establish that no other record system was likely to produce responsive documents. *Id.* (citing *Rep. Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017)). Plaintiffs maintain that the CIA has failed to do so. Pls.' Mot. 3.

In response, the CIA declined to address this burden. Instead, it contends that it does not need to address the adequacy of its search for records because plaintiffs waived the issue. CIA Reply 2. In an affidavit, it explains that plaintiffs and the CIA held a telephone conference to determine the issues to be presented to the Court. Aff. of Darrell Valdez ("Valdez Aff.") ¶ 7, ECF No. 31-1. In his sworn declaration, CIA counsel Valdez asserts: "In order to narrow the issues to be presented to the Court, I specifically asked [plaintiffs' counsel] Mr. Clarke what issues the plaintiffs had with the Defendant's responses, and Mr. Clarke stated that the plaintiffs were only challenging 'the redactions and withholdings.'" *Id.* Following the conference, CIA counsel filed a status report on behalf of the CIA. ECF No. 20. CIA counsel sent the status report draft to opposing counsel who confirmed that the representation was "perfect." Valdez Aff. ¶¶ 8–9. But plaintiffs' counsel contests this representation in a dueling affidavit. Aff. of John Clarke ("Clarke Aff.") ¶ 1, ECF No. 38-1. Clarke says that the plaintiffs never agreed to narrow their objections or waive a challenge to the adequacy of the CIA's search. *Id.*

That status report could have waived the search—*if* it included language that indicated waiver. But this Court's review of the status report shows that it lacks language that would indicate waiver of the adequate search issue. Waiver is indicated when terms like "narrow" or "withdraw"

are used. *See, e.g., Am. Ctr. for Law & Just. v. Dep't of Just.*, 325 F. Supp. 3d 162, 167–68 (D.D.C. 2018). Those explicit terms are not present in the status report. *See* ECF No. 20.

Additionally, while courts in this Circuit have recognized a waiver of rights in a FOIA action based on a status report, this typically occurs in a *joint* status report. *Am. Ctr. for Law & Just.*, 325 F. Supp. at 167–68 ("Thus, when a plaintiff narrows his FOIA request in a joint status report, it supersedes any broader request set in the plaintiff's complaint.") (citing *DeFraia v. Cent. Intel. Agency*, 311 F. Supp. 3d 42, 47–48 (D.D.C. 2018)). Even the cases cited by CIA in support of their assertion of waiver require a *joint* status report to be filed. *See e.g., DeFraia*, 311 F. Supp. 3d at 48; *Gilman v. U.S. Dep't of Homeland Sec.*, 32 F. Supp. 3d 1, 22 (D.D.C. 2014); *People for Am. Way Found. v. U.S. Dep't. of Just.*, 451 F. Supp. 2d 6, 12 (D.D.C. 2006). Here, the status report was filed only by the defendant, not jointly. ECF No. 20.

The Court thus finds that plaintiffs have not waived their objection to the adequacy of the CIA's search. While the Blaine Declaration engages in discussion of adequacy, the CIA does not brief nor respond to arguments made by plaintiffs about adequacy. Blaine Decl. ¶¶ 19–37. Accordingly, the Court will **ORDER** defendants to supplement the record regarding the adequacy of their search for documents.

In their discussion of the CIA's search, plaintiffs repeatedly state that the CIA must search its operational files. Pls.' Mot. 7. As this Court has recently explained, the CIA's "[o]perational files are typically exempt from search and disclosure, but this Court [can] order[] their search under an exception." *Hall v. Cent. Intel. Agency*, No. 04-cv-814, 2022 WL 2528102, at *1 (D.D.C. July 7, 2022) (citing 50 U.S.C. § 3141(a)). That exception is statutorily defined and has certain requirements. *See* 50 U.S.C. § 3141(f). Plaintiffs do not raise that exception here. Accordingly, the Court will not order the CIA to search its operational files at this time.

## B.  The CIA's Application of FOIA Exemptions

The CIA invoked three exemptions under the FOIA: Exemptions 1, 3, and 6. CIA Mot. 6–21. Plaintiffs marshal a number of arguments to oppose the CIA's invocation of these exemptions. For the most part, the Court is not persuaded and grants summary judgment in favor of the CIA for the withholdings. However, as explained below, the Court will deny the CIA summary judgment on two of the CIA's *Glomar* responses.

### 1.  Exemption 1

The CIA withheld a number of documents in full or in part pursuant to Exemption 1. For records redacted in part, plaintiffs argue that the CIA has not complied with Executive Order 13526's automatic declassification requirements. Pls.' Mot. 23–25. As detailed below, this argument fails. Additionally, the CIA invoked a *Glomar* response to several of plaintiffs' requests. Blaine Decl. ¶ 48. Plaintiffs contest the invocation of *Glomar* responses by raising the official acknowledgment exception. Pls.' Mot. 30. After reviewing the record, the Court will deny the CIA's motion for summary judgment on two of its *Glomar* responses.

### (i)  *The CIA Properly Applied FOIA Exemption 1*

Exemption 1 protects any information that is classified "under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Currently, the operative Executive order is Executive Order 13526, which allows classification if the following conditions are met:

> (1) an original classification authority is classifying the information
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result

> in damage to the national security, which includes defense against
> transnational terrorism, and the original classification authority is
> able to identify or describe the damage.

Exec. Order No. 13,526 § 1.1(a), 75 Fed. Reg. 707 (Dec. 29, 2009).

The "categories of information" listed in section 1.4 include "(a) military plans, weapons

systems, or operations; (b) foreign government information; (c) intelligence activities (including

covert action), intelligence sources or methods, or cryptology; (d) foreign relations or foreign

activities, including confidential sources; (e) scientific, technological, or economic matters relating

to the national security . . . (g) vulnerabilities or capabilities of systems, installations,

infrastructures, projects, plans, or protection services relating to the national security; or (h) the

development, production, or use of weapons of mass destruction." Exec. Order No. 13,526 § 1.4,

75 Fed. Reg. 707 (Dec. 29, 2009).

An agency "bears the burden of proving the applicability of claimed exemptions." *A.C.L.U.*

*v. U.S. Dep't of Def.,* 628 F.3d 612, 619 (D.C. Cir. 2011). In the national security context in

particular, an agency's affidavit merits deference. *Id.* A court is required to "accord substantial

weight to an agency's affidavit concerning the details of the classified status of the disputed

record." *Id.* (quoting *Wolf*, 473 F.3d at 374).

Here, the CIA used Executive Order 13526 subsection 1.4(c) as its basis for classification.

Vaughn Index; CIA Mot. 9. Subsection 1.4(c) allows for the classification of documents regarding

"intelligence activities (including covert action), intelligence sources and methods, or cryptology."

Exec. Order 13,526 § 1.4(c), 70 Fed. Reg 707 (Dec. 29, 2009). In support of this classified status,

the CIA filed a sworn declaration from an original classification authority, Vanna Blaine.[1] Blaine

---

[1] Original classification authority is the power to review and determine whether and why materials are classified according to specific criteria. Exec. Order No. 13,526 § 1.1, 75 Fed. Reg. 707 (Dec. 29, 2009). Executive Order 13,526 vests original classification authority with agency heads. *Id.* § 1.3(a)(2). This can be delegated to lower level employees. *Id.* § 1.3(c). Blaine, by her sworn declaration, has been vested with this authority. Blaine Decl. ¶ 3.

Decl. ¶ 3. Blaine determined that records requested by the plaintiffs would reveal the "priority of intelligence activities and targets; methods of collection; and classified relationships." *Id.* at ¶ 44. The affidavit goes further to say that disclosure of particular operations or targets could allow "intelligence targets to circumvent the CIA's collection efforts[.]" *Id.* at ¶ 45. It also states that "[o]nce the nature of an intelligence method or the fact of its use in a certain situation is discovered, its usefulness in that situation is neutralized and the CIA's ability to apply that method in other situations is significantly degraded." *Id.* at ¶ 46. Moreover, "[r]evelation of these relationships could hurt the Agency's relationship with these entities—entities that often agree to cooperate with the CIA on the understanding the relationship will remain secret." *Id.* at ¶ 47.

These explanations and the sworn affidavit from an original classification authority meet the required standard for summary judgment. In the FOIA context, courts have consistently deferred to executive affidavits like Blaine's that "predict[] harm to national security, and have found it unwise to undertake searching judicial review." *A.C.L.U. v. Dep't of Def.*, 628 F.3d at 624 (quoting *Ctr. for Nat. Sec. Studies v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003)). The CIA's argument here is both "plausible" and "logical." *Id.* (citing *Wolf*, 473 F.3d at 374–75). "Because courts 'lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case,' we 'must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Id.* at 619. (internal citations omitted).

Despite the CIA's explanation and affidavits, plaintiffs raise three arguments to the CIA's withholdings under Exemption 1. None are persuasive.

Plaintiffs first contend that the CIA have not complied with the automatic declassification requirements put in place by Executive Order 13526. Pls.' Mot. 23–25. Executive Order 13526's

automatic declassification provisions delineate the materials that should be declassified after a document turns 25 years old, if certain exceptions do not apply. Exec. Order 13,526 § 3.3. Most of the documents withheld under Exemption 1 here are over 25 years old, so they are automatically declassified unless the CIA can identify a relevant exception.

The CIA identifies two exceptions to the automatic declassification provision relevant here. CIA Reply 7. The material withheld by CIA, as denoted in the *Vaughn* Index, could "demonstrably be expected to" both "reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence or security service of a foreign government or international organization, or a nonhuman intelligence source; or impair the effectiveness of an intelligence method currently in use, available for use, or under development," or "reveal information, including foreign government information, that would cause serious harm to relations between the United States and a foreign government, or to ongoing diplomatic activities of the United States." Exec. Order 13526 § 3.3(b). The Blaine Declaration certifies that all material withheld pertains to "intelligence activities," "intelligence methods," and "classified relationships," Blaine Decl. ¶¶ 44–47, which plainly fall within these two exceptions to automatic declassification.

Plaintiffs next argue that the withheld records are too old to justify continued classification. *See* Pls.' Mot. 24. Plaintiffs assert that the justifications for the continued classification of records "would pertain to the present day, not a half-century ago." *Id.* Citing no evidence, plaintiffs claim that the release of withheld files would not damage national security. *Id.* But this Court is not in a position to second-guess an agency's classification decisions absent a contradiction on the record or evidence of bad faith. *A.C.L.U. v. U.S. Dep't of Def.*, 628 F.3d at 619.

10

Plaintiffs final argument regarding the Exemption 1 withholdings is that the McCain Act requires the CIA to turn over the documents that plaintiffs requested to the Department of Defense ("DOD") and for the DOD to make them available in a "library-like location." Pls.' Mot. 21–22; CIA Reply 9. This argument also misses the mark. The McCain Act does not direct the CIA to declassify documents—in fact, it specifically exempts classified material. *See National Defense Authorization Act for Fiscal Years 1992 and 1992, Pub. L. 102–190 § 1082(b)(A).* It provides in pertinent part that the DOD will *not* make records available if "the record or other information is exempt from the disclosure requirements of section 552 of title 5, United States Code, by reason of subsection (b) of that section." *Id.* Accordingly, because this information is otherwise exempt under Exemption 1, the National Defense Authorization Act does not mandate that the CIA turn the documents over.

The CIA has established that its materials are properly classified under Executive Order 13526.

### (ii) *The CIA's Glomar Responses Are In Part Contradicted By Official Acknowledgement*

Executive Order 13526 § 3.6(a) permits an agency to refuse to confirm or deny the existence of classified records. Executive Order 13,526 § 3.6(a), 75 Fed. Reg. 707 (Dec. 29, 2009). This response, called a *Glomar* response, is warranted under Exemption 1 "whenever the fact of [the classified records] existence or nonexistence itself is classified under this order or its predecessors." *Id.* In other words, if disclosure of whether an agency had documents about a certain topic would reveal whether the agency has an "intelligence interest" in that topic, the agency can refuse to identify whether it has responsive documents. *ACLU v. Cent. Intel. Agency*, 710 F.3d 422, 428–29 (D.C. Cir. 2013). The CIA utilized a Glomar response for seven of plaintiffs' twenty-one requests. Blaine Decl. ¶ 39.

The CIA asserted that confirming or denying the existence of records relating to seven of plaintiffs' requests would "reveal sensitive information about the CIA's intelligence interests, personnel, capabilities, authorities, and resources." CIA Mot. 14; *see also* Blaine Decl. ¶¶ 50–53. It thus maintains that the existence of the records itself is classified under Executive Order 13526. *Id.* Plaintiffs do not appear to dispute that the existence of these records *could* be properly classified under Exemption 1. Accordingly, the Court holds that the existence or nonexistence of the requested records could be withheld under Exemption 1.

That is not the end of the *Glomar* analysis, however. An agency may not claim a *Glomar* response when it has already officially "disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect." *ACLU*, 710 F.3d at 427 (citing *Wolf*, 473 F.3d at 379–80). Latching on to this exception, plaintiffs assert that the CIA cannot utilize a *Glomar* response here because it has publicly acknowledged an intelligence interest in POWs. ECF No. 25 at 34.

In the context of a *Glomar* response, this official-acknowledgement exception is triggered when "the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request," even if *the content of the records themselves* have not been disclosed. *Id.* (quoting *Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1081 (D.C. Cir. 2012). The existence of records is officially acknowledged if "(1) the information requested [is] as specific as the information previously released; (2) the information requested [matches] the information previously disclosed; and (3) the information requested [has already] been made public through an official and documented disclosure." *ACLU v. Dep't of Def.*, 628 F.3d 612, 620–21 (D.C. Cir. 2011).

For example, in *American Civil Liberties Union v. CIA*, the CIA claimed a broad *Glomar* response after plaintiffs sought records pertaining to the use of drones to carry out targeted killings.

710 F.3d at 425. The CIA asserted that it did not want to confirm or deny whether it had an intelligence "involvement or interest" in drone strikes. *Id.* at 428.  But the Circuit held it was not "logical or plausible" for the CIA to contend that disclosing a potential intelligence interest in drones "would reveal something not already officially acknowledged." *Id.* at 429. Why? Because there was a robust public record available to demonstrate that the CIA had acknowledged an interest in drone strikes. *Id.* A range of executive officials, including the President of the United States, had publicly discussed the United States' participation in targeted drone strikes. *Id.* In other words, the plaintiffs request was for "information requested . . . already . . . public through an official and documented disclosure." *A.C.L.U. v. Dep't of Def.*, 628 F.3d at 620–21.

With that framework in mind, the Court will consider each of plaintiffs' seven requests to which the CIA issued a *Glomar* response to determine whether the CIA has already publicly acknowledged an intelligence interest in the requested information. The Court will grant summary judgment to the defendants with respect to five requests that the CIA issued a *Glomar* response to. The Court will deny summary judgment with respect to the other two requests.

Plaintiffs' request 1 asks for "all records" of the CIA's efforts in undertaking "clandestine and covert action to locate, identify, and recover those U.S. prisoners of war still in Communist custody" from "the period of March 16, 1954 through 1961." Compl. ¶ 8. The CIA has already publicly acknowledged an intelligence interest in POWs during this time period, as evidenced by documents the CIA has previously released. For example, attached to plaintiffs' FOIA request were a number of previously released CIA Information Reports from the 1950s. *See* ECF No. 9-1 at 12–36. These documents demonstrate that the CIA at least had an intelligence interest in POWs in communist custody in the 1950s and were collecting information about various POW camps. *Id.* Accordingly, the CIA cannot maintain a *Glomar* response on plaintiffs' request 1. The

information released prior is as specific as the information requested by the plaintiffs and the information requested matches the information previously disclosed. *ACLU*, 628 F.3d at 620–21. The documents were made public through an official and documented disclosure. Therefore, the Court will deny the CIA summary judgment on their *Glomar* response to request 1 and order it to supplement its *Vaughn* index.

Because of the multiple subcomponents of plaintiffs' request 17 regarding the Combined Command for Reconnaissance Activity Korea ("CCRAK"), *see* ECF No. 9-1 at 7, the Court will also deny summary judgment in regard to request 17 and order the CIA to explain in greater detail its *Glomar* response with respect to each subcomponent. Compl. ¶ 8. Plaintiffs' exhibits have passing references at some of the elements of request 17 and the Court believes that a *Glomar* response may only be appropriate with respect to some of subcomponents.

Unfortunately for plaintiffs, that is as far as the official acknowledgement exception will carry their objections to *Glomar* responses. Plaintiffs' request 5 asks for "[a]ll records upon which the following statement from February 27, 1952 Memo from Chief of Naval Personnel to Commanding General, Far East Air Force was based: "It is believed that there is a possibility that Captain Moore survived and is now a prisoner of war." Compl. ¶ 8. Plaintiffs have pointed to no evidence that suggests the CIA has officially acknowledged intelligence interests or connections to Harry Moore. The same logic applies to request 6, which requests all records regarding Moore's incarceration, transportation to the Soviet Union, and evidence he may have been interrogated. *Id.* ¶ 8.[2]

---

[2] Plaintiffs imply that the CIA is biased against them by noting that the CIA invoked a *Glomar* response to records regarding Captain Moore but not to any of the other 135 names the CIA searched their records for. Pls.' Mot. 31. That characterization is inaccurate. It is true that the CIA asserted a *Glomar* response to plaintiffs' requests 5 and 6—which involve Captain Moore—but did search and release documents responsive to plaintiffs' request 15, which involved 135 other names of POWs. Blaine Decl. ¶¶ 33, 39. But plaintiffs' requests 5 and 6 are considerably more specific and ask for records upon which specific statements and documents were based. Pls.' Mot. 31 n.18. Plaintiffs' request 15

Request 13 asks for information related to a report from the State Department about American POWs in Soviet prison camps formed from the testimony of a former KGB officer. Compl. ¶ 8. Yet, again, plaintiffs proffer no evidence to suggest a public CIA acknowledgement regarding this KGB officer or report.

Request 16 asks for information "relating that POWs/MIAs may have been held in the prisons identified in the attached list of Russian prison camps." Compl. ¶ 8. Plaintiffs have shown the Court no evidence to suggest that the CIA has publicly acknowledged an intelligence interest in POWs in the list of specific Russian prison camps provided. While the plaintiffs do have information that may demonstrate CIA interest in Russian prison camps generally, that information is not specific to the issue of POWs and thus fails the official acknowledgment test. ECF No. 25-5 at 13–14, 85–240.

Request 21 asks for information relating to Jan Sejna and other Czech defectors' statements regarding the "US POWs held, interrogated and experimented on" by the Soviet Union and its satellite states. Compl. ¶ 8. The only proffered public CIA references to Jan Sejna or other Czech defectors come from a CIA minute report, which states that Sejna would be testifying before a Senate Select Committee. ECF No. 25-5 at 364. That simple reference is not sufficient to demonstrate official acknowledgement of an intelligence interest in Sejna.[3]

Accordingly, the Court will order the CIA to supplement its *Vaughn* Index as to request 1, having found that the CIA had publicly acknowledged an intelligence interest in request 1's

---

is far broader and asks merely for documents relating to any of the 135 names on the list. Pls.' Mot. n.19. The Court finds this a more likely and plausible explanation for the discrepancy, as opposed to bad faith.

[3] While the CIA invokes *Glomar* in conjunction with Exemption 1 and Exemption 3 of FOIA, plaintiffs do not appear to dispute the exemptions apply and instead only argue that the CIA has officially acknowledged an intelligence interest publicly. CIA Mot. 12–15; Pls.' Mot. 32–37. Therefore, after upholding the CIA's use of Exemption 1 for its *Glomar* responses, the Court limits its analysis to the official acknowledgement exception and will not address Exemption 3.

subjects. The Court will also order the CIA to supplement the record with additional justification regarding its *Glomar* response on request 17. But the Court will approve of the CIA's *Glomar* response regarding requests 5, 6, 13, 16 and 21.[4]

### 2. Exemption 3

The CIA also withheld records pursuant to Exemption 3 of the FOIA. Plaintiffs' limited challenge to the CIA's invocation of Exemption 3 boil down to the withheld records being too old to be covered. As explained below, the Court rejects these arguments.

#### (i) CIA Properly Applied FOIA Exemption 3

Exemption 3 provides that files are exempt from FOIA disclosure if they are:

> specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—
>
> (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
>
> (ii) establishes particular criteria for withholding or refers to particular types of matter to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3). The CIA is specifically relying on two statutes, the National Security Act of 1947 and the Central Intelligence Agency Act of 1949 ("CIA Act"), for its Exemption 3 withholdings. CIA Mot. 11–12.

The National Security Act of 1947 states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). The CIA Act, on the other hand, provides that "the Agency shall be exempted from . . . the

---

[4] Plaintiffs argue that the CIA raised a collateral estoppel defense regarding its *Glomar* responses. Pls.' Mot. 15. The CIA did engage in a discussion of the plaintiffs' prior FOIA request in its motion for summary judgment. CIA Mot 2. Yet the CIA never attempted to use this discussion to bar an inquiry into their *Glomar* responses. *See id.* Regardless, in its reply the CIA expressly denies any collateral estoppel defense stating: "At no time in its summary judgment motion, however, did Defendant ever raise a collateral estoppel defense." CIA Reply 5.

provisions of any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency . . . ." 50 U.S.C. § 3507. Both statutes are considered exemption statutes for the purposes of Exemption 3. *DiBacco v. Dep't of the Army*, 926 F.3d 827, 834 (D.C. Cir. 2019).

Plaintiffs argue that the statutes are improperly applied here. Pls.' Mot. 25–26. Starting with the CIA Act, the plaintiffs argue that defendant fails to distinguish between more recently employed personnel and employees from over sixty years ago. *Id.* at 25. According to plaintiffs, the CIA Act no longer protects the "functions," "names," "official titles," or "numbers" of personnel employed by the CIA in the 1950s. *Id.* But in *DiBacco v. Department of the Army*, the Circuit addressed this very question: Does the CIA Act's exemption of personnel related files from disclosure apply to past CIA personnel? 926 F.3d at 835–36. The Circuit answered in the affirmative: "[W]e think it fair to say that the CIA Act's text does not expressly restrict its scope to personnel currently employed by the agency." *Id.* at 836. Because the CIA Act refers to both current and former employees, *id.*, it is properly applied here.

Plaintiffs also object to withholdings under the National Security Act of 1947. Again, they claim that the CIA records—from as early as the 1950s—are too old to be fall within the purview of the National Security Act. Pls.' Mot. 25–26. But "[t]he judiciary 'is in an extremely poor position to second-guess' the predictive judgments made by the government's intelligence agencies." *Larson*, 565 F.3d 857, 865 (citing *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 928). Given that the CIA has provided an uncontradicted affidavit asserting that the records withheld include information regarding "intelligence sources and methods," Blaine Decl. ¶¶ 55–60, they are properly withheld under the National Security Act. This Court will not compel their disclosure.

As discussed above, the CIA's *Vaughn* Index and the Blaine Declaration provide persuasive evidence that these documents are properly withheld under Exemption 3 because they contain either intelligence methods or information about CIA personnel. The Court will adhere to Circuit precedent that accords substantial weight to an agency's affidavits justifying classification:

> If an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information falls within the claimed exemption and evidence in the record does not suggest otherwise, as is the case here, the court should not conduct a more detailed inquiry as to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions.

*Larson*, 565 F.3d at 865.

This Court finds that the CIA has properly withheld records under Exemption 3.

### 3. Exemption 6

Exemption 6 protects materials from disclosure which contain "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(6). In this context, "similar files" includes "detailed Government records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (quoting H.R. Rep. No. 1497). Whether a document falls within "similar files" turns "solely [on] whether the information in the file 'applies to a particular individual.'" *New York Times v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1007 (D.C. Cir. 1990) (citing *Wash. Post Co.*, 456 U.S. at 602).

The CIA claims that the records it withheld under Exemption 6 are "similar files" because they contain "personally identifiable information, including names, signatures, and other identifying information" including "names, official titles, location, telephone number, and email addresses." Blaine Decl. ¶ 62; Vaughn Index 22. The CIA withheld portions of nineteen records

that contain names, titles, locations, and other identifying information related to working-level CIA personnel. Blaine Decl. ¶¶ 62–64. This Court agrees with the CIA that these constitute "similar files."

Because the records in question involve "similar files," this Court must next determine whether the release of the files "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 may be utilized so long as the privacy interest implicated is not *de minimis*. *Gilman*, 32 F. Supp. 3d at 10 (citing *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229–30 (D.C. Cir. 2008)). For example, "the privacy interest in avoiding unlimited disclosure of [one's] name and address is significant." *Nat'l Ass'n of Retired Fed. Emp. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989). There is beyond a *de minimis* interest here.

Once something beyond a *de minimis* interest is identified, the Court must determine whether the release of such information is unwarranted. *Gilman*, 32 F. Supp. 3d at 10. To determine whether a request is "unwarranted," "a court must balance the public interest in disclosure against the interest Congress intended the Exemption to protect." *Dep't of Just. v. Rep. Comm. for the Freedom of Press*, 489 U.S. 749, 776 (1989). And the "only relevant public interest in the FOIA balancing analysis" is "the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *U.S. Dep't of Def. v. Fed. Lab. Rel. Auth.*, 510 U.S. 487, 497 (1994) (quoting *Rep. Comm. for Freedom of the Press*, 489 U.S. at 773).

Both parties make arguments about the level of interest on the private and public side. *See* CIA Mot. 19; Pls.' Mot. 27. But the balancing test here leans in favor of the CIA. The Court does not think it necessary to engage in a particularly rigorous analysis of the rights at stake because the public interest is clearly zero. As the Blaine Declaration states:

> [T]here is no countervailing public interest in disclosure. Revealing
> the identities of these specific individuals, or information that would
> allow them to be identified, will not shed light on the conduct of the
> Agency's activities or operations beyond what is already being
> disclosed to the public through the release in part of these records.

Blaine Decl. ¶ 62. The Court agrees. It is difficult to see how "names, Agency identification

numbers, and email addresses" or "telephone numbers" of specific, individual agents would give

citizens any insight into "what their government is up to." Vaughn Index 1, 3; *Fed. Lab. Rel. Auth.*,

510 U.S. at 497 (citing *Reporters Comm. for Freedom of the Press*, 489 U.S. at 773).

The CIA argues that the "release of the redacted names and other identifying information

is reasonably likely to subject those individuals or those associated with them to increased

harassment or threats based on their association with the CIA," Blaine Decl. ¶ 62. That is an

assessment the Court is not inclined to dispute, given the fact that courts in this Circuit have

consistently held that government officials have privacy interests in avoiding harassment:

> In their capacity as public officials FBI agents may not have as great
> a claim to privacy as that afforded ordinarily to private citizens, but
> the agent by virtue of his official status does not forgo altogether
> any privacy claim in matters related to official business. As several
> courts have recognized, these agents have a legitimate interest in
> preserving the secrecy of matters that conceivably could subject
> them to annoyance or harassment in either their official or private
> lives.

*Lesar v. U.S. Dep't of Just.*, 636 F.2d 472, 487 (D.C. Cir. 1980); *see also Brannum v. Dominguez*,

377 F. Supp. 2d 75, 84 (D.D.C. 2005). Therefore, however modest the privacy interest may be in

the eyes of the plaintiffs, something will always outweigh zero. "We have been shown no public

interest in, and a modest personal privacy interest against, disclosure of the names and addresses

of individuals. . . . We need not linger over the balance; something, even a modest privacy interest

outweighs nothing every time." *Horner*, 879 F.2d at 879.

Plaintiffs, citing this Court's decision in *Hall v. CIA*, aver that the privacy interests of the individuals in the withheld records have diminished because of age and are no longer protected. Pls.' Mot. 27. But in *Hall* "the names . . . themselves appear[ed] to be the subject of substantial public interest." *Hall*, 268 F. Supp. 3d at 162. The fact that the privacy interest of individuals had diminished because of age was only relevant *because* there was a countervailing substantial public interest. *Id.* Here, plaintiffs do not contend and indeed the CIA disputes that the personal information at issue is itself of substantial public interest. Blaine Decl. ¶ 62. Accordingly, even if the privacy interests have diminished somewhat with age, the public interest remains *de minimis*.

The Court is also unpersuaded by plaintiffs' argument that some of the individuals may be deceased and therefore lack a privacy interest. Pls.' Mot 28. Even upon the death of individuals, there are "reputational and family related privacy expectations that survive death."[5] *Campbell v. U.S. Dep't of Just.*, 193 F. Supp. 2d 29, 41 (D.D.C. 2001) (quoting *Campbell v. Dep't of Just.*, 164 F.3d 20, 33 (D.C. Cir. 1998)). That fact, combined with the CIA's sworn assertion that it cannot locate every individual mentioned in the records to discover if they are deceased, tilts the balance of interest in favor of the CIA. Supp. Blaine Decl., ECF No. 31-3 at ¶ 6.

The Court finds that the CIA has properly withheld documents under Exemption 6.

## C. The CIA Conducted an Adequate Segregability Analysis

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such a record after deletion of the portions which are exempt under this subsection." 5 U.S.C. 552(b). The CIA's search for documents responsive to the plaintiffs' request yielded four documents that the Agency withheld in full. CIA Mot. 22. The CIA argues that that there was no reasonably segregable information in the four withheld documents. *Id.* The CIA also

---

[5] While *Campbell* discusses Exemption (7)(c), D.C. Circuit has held that the privacy inquiries in Exemption (6) and (7)(c) are "essentially the same." *Judicial Watch v. Dep't of Just.*, 365 F.3d 1108, 1125 (D.C. Cir. 2004).

explained that for documents redacted in part, agents conducted a "line-by-line review" of each document to identify all non-exempt information. *Id.*; Blaine Decl. ¶ 65.

"It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117 (citing *Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007)). Yet, "agencies must still demonstrate with 'reasonable specificity' the bases for their conclusions regarding segregability." *Khatchadourian*, 453 F. Supp. 3d at 81. "An agency 'must usually submit a sufficiently detailed *Vaughn* Index for each document and an affidavit or declaration stating that it has released all segregable material' to meet this burden. A conclusory affidavit or declaration is insufficient." *Id.* at 82 (citations omitted).

Here, the Court concludes that the CIA has submitted an adequate *Vaughn* Index and declaration to explain the withholdings. "Courts in this Circuit have indeed held that an agency satisfied its burden in cases where the agency 'conducted a line-by-line review and disclosed all reasonably segregable non-exempt information.'" *Id.* at 114. (citing *Sack v. Cent. Intel. Agency*, 49 F. Supp. 3d 15, 23 (D.D.C. 2014)). Here, the CIA submitted a detailed *Vaughn* Index, especially regarding the four documents withheld in full. For each document, the CIA provided a short one-line summary of what the document contains, states the FOIA exemptions under which it is withheld along with the document's level of classification, and states the harm that would result from its disclosure. Vaughn Index 22–27. This *Vaughn* Index, in combination with its affidavit explaining that it conducted a line-by-line segregability review, Blaine Decl. ¶ 65, fulfills the CIA's segregability requirement.

### D. *In Camera* Review is Neither Necessary nor Appropriate Here

Courts have broad discretion to decide whether *in camera* review of documents is necessary. *100Reporters*, 248 F. Supp. 3d at 166. As this court has previously explained:

> *In camera* review is "'particularly appropriate when either the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency,' when the number of documents withheld is relatively small, or 'when the dispute turns on the contents of the withheld documents, and not the parties' interpretations of those documents.'"

*Khatchadourian*, 453 F. Supp. 3d at 83–84 (citing *Hall*, 881 F. Supp. 2d at 74). "If the agency's affidavits 'provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.'" *Larson*, 565 F.3d at 870 (quoting *Hayden*, 608 F.2d at 1387). In such instances, *in camera* review is "neither necessary nor appropriate." *ACLU*, 628 F.3d at 626 (quoting *Hayden*, 608 F.2d at 1387).

Here, *in camera* review is neither necessary nor appropriate. There is no bad faith or contradictory evidence present in the record. While plaintiffs make several unsubstantiated claims of bad faith, ECF No. 25-9 at 9, 11–12, all but one of the claims are speculative and irrelevant to the issue of classification before the court. The majority of the claims made in plaintiffs' statement of material facts, *id.* ¶¶ 64, 66–67, 76–80, are not evidence of bad faith under Circuit precedent. Broadly proclaiming "bad faith non-disclosures" or "bad faith changes of status of POWs" is not sufficient to illustrate that *in camera* review is necessary. ECF No. 25-9 at 9, 11–12. As this Court has previously explained, "a court will not find bad faith by a 'mere allegation of agency misrepresentation or bad faith nor by past agency misconduct in other unrelated cases.'" *Khatchadourian*, 453 F. Supp. 3d. at 79 (quoting *Hayden*, 608 F.2d at 1387).

Plaintiffs' point to one discrepancy in the CIA's FOIA production: a document was released prior to the plaintiffs' FOIA request by the CIA with one less redaction than the copy provided to the plaintiff. ECF No. 25-9 at ¶ 65. In response, the CIA admitted that this discrepancy was made in error and reissued the less-redacted version to the plaintiffs. ECF No. 32-1 at ¶ 65. This is not evidence of bad faith. An "inconsistent approach to the classification designations of several records is not evidence of bad faith [when the agency] has subsequently corrected any errors." *Khatchadourian*, 453 F. Supp. 3d at 79.

This Court will continue to adhere to longstanding D.C. Circuit precedent that "[t]he ultimate criterion is simply this: Whether the district judge believes that *in camera* inspection is needed in order to make a responsible de novo determination on the claims of exemption." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978). As there is no bad faith or contradictory evidence in the record, Circuit precedent would instruct that "it can't hurt" is not a good enough justification for *in camera* review. *Larson*, 565 F.3d at 870 (quoting *Turner*, 587 F.2d at 1195).

## IV.    CONCLUSION

Based on the foregoing, the Court will **DENY** plaintiffs' motion for summary judgment and **GRANT IN PART** and **DENY IN PART** defendant's motion for summary judgment. ECF No. 25; ECF No. 21.

The Court will **DENY** without prejudice both plaintiffs' and defendant's motions for summary judgment with respect to (1) the adequacy of the CIA's records search and (2) the CIA's *Glomar* response to plaintiffs' requests 1 and 17. The Court will **ORDER** defendant to supplement the record regarding the adequacy of the search and its *Glomar* response to plaintiffs' request 17. The Court will further **ORDER** defendant to identify potential responsive documents to plaintiffs' request 1. The Court will **GRANT** defendant's motion for summary judgment and **DENY** plaintiffs' motion for summary judgment with respect to (1) the application of FOIA Exemptions

24

1, 3, and 6 (except for the documents responsive to requests 1 and 17); and (2) the segregability

analysis. Finally, the Court will **DENY** plaintiff's motion for *in camera* review.


Date: July 14, 2022

Hon. Royce C. Lamberth
United States District Judge